

David B. Hennes
Samuel P. Groner
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York  10004-1980
(212) 859-8000
david.hennes@friedfrank.com
samuel.groner@friedfrank.com

Attorneys for Plaintiff

**12 CV 5336**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CATALENT PHARMA SOLUTIONS, INC.,

                                    Plaintiff,

- against -

SHARP CORPORATION and UNITED DRUG PLC,

                                    Defendants.

---

12 Civ. _____ ( ___ )

**ECF CASE**

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Catalent Pharma Solutions, Inc. ("Catalent"), by its attorneys, for its Complaint in this action, alleges as follows:

## NATURE OF ACTION

1.      This is an action for damages arising from the clear breach by Sharp Corporation ("Sharp") and its publicly-traded parent company, United Drug Plc ("United Drug"), of their obligations under a non-disclosure agreement that Sharp entered into with Catalent on August 12, 2011 (the "Agreement"), resulting in the unauthorized and improper disclosure and use of Catalent's highly confidential and sensitive business information.

2.      Beginning in the summer of 2011, Catalent, a leading provider of advanced drug development services, delivery technologies, and manufacturing supply solutions to pharmaceutical, biotechnology, and consumer healthcare companies, began exploring a potential

sale of its U.S. commercial packaging business (the "U.S. Packaging Business"). The sale process was highly confidential and only carefully selected potential buyers were permitted to participate in the process.

3.      In the summer of 2011, Sharp, one of the most significant competitors to Catalent's U.S. Packaging Business, expressed interest in participating in the sale process. Because the sale process itself was confidential and the information that would be shared during the diligence process was highly sensitive, before allowing Sharp to participate, Catalent required Sharp to sign a non-disclosure agreement. Since Sharp and its parent company, United Drug, demonstrated that they were acting in concert with one another, as a result of United Drug's direct participation in all phases of the sale process, United Drug unequivocally manifested its intent to be bound by the Agreement and/or to assume the Agreement signed by Sharp. In that Agreement, Sharp and United Drug agreed not to, among other things, disclose the fact that Catalent was in the process of attempting to sell its U.S. Packaging Business or make use of Catalent's confidential information for any purpose except to evaluate the possible acquisition of Catalent's U.S. Packaging Business (a "Possible Transaction").

4.      As part of the sale process, Sharp and United Drug (i) received multiple confidential presentations from Catalent management, (ii) accessed a confidential Catalent electronic "data room" at least 25 times and viewed 140 of Catalent's confidential documents, (iii) participated in three tours of Catalent facilities, and (iv) provided a written indication of interest in acquiring the U.S. Packaging Business at a price of up to $80 million. Based on this conduct, Catalent determined that United Drug was the bidder most likely to purchase the U.S. Packaging Business and, therefore, United Drug received the greatest amount of access and attention from Catalent's management team. Nonetheless, in early November 2011, Sharp and United Drug

determined not to submit a firm written offer to acquire the U.S. Packaging Business, which would have allowed them to advance to the next round in the sale process. However, they did not withdraw from the sale process; instead, Sharp and United Drug stated that they would continue to consider purchasing the U.S. Packaging Business, but only at an unidentified price significantly lower than their indication of interest.

5.      Shortly thereafter, in clear breach of the Agreement, Liam Fitzgerald, the Chief Executive Officer of United Drug, publicly disclosed the sale process, disparaged Catalent's business, and admitted that Sharp and United Drug were using Catalent's highly confidential and sensitive business information to poach Catalent's customers.

6.      On November 16, 2011, United Drug held two conference calls to provide the public with information about its quarterly earnings. During the first conference call, Mr. Fitzgerald stated, in clear breach of the Agreement, that "Catalent . . . is being sold at the moment," that Catalent is "underperforming significantly," and that "there is a good opportunity for us to pick up [Catalent's] business off the back of that deal." A transcript of that conference call, with the relevant text marked, is attached as Exhibit A.

7.      During the second conference call, Mr. Fitzgerald stated, also in clear breach of the Agreement, that "Catalent is currently going through a sale process," that Catalent "has been under-invested through its private equity owners over the last couple of years," and that, as a result of the sale process, Sharp was "picking up a lot of clients from that business." A transcript of that conference call, with the relevant text marked, is attached as Exhibit B.

8.      Thus, in an obvious, overt, and bad faith effort to drive down the value of the U.S. Packaging Business and profit from the highly confidential and sensitive business information that they received pursuant to the Agreement, Sharp and United Drug breached the Agreement in

3

three separate ways. *First*, they disclosed the existence of the sale process, in breach of their

obligation not to "disclose . . . the fact that discussions or negotiations concerning a Possible

Transaction are or were taking place." Agreement ¶ 4. *Second*, by using Catalent's highly

confidential and sensitive business information to "pick up" Catalent's "business off the back of

that deal" (*see* Exhibit A) and to "pick[] up a lot of clients" (*see* Exhibit B), they breached their

obligation not to use the information that they were provided during the diligence process "for

any competitive purpose." Agreement ¶ 1. *Third*, by disclosing their view that Catalent had

been "underperforming significantly" (*see* Exhibit A) and "under-invested through its private

equity owners over the last couple of years" (*see* Exhibit B), they breached their obligation not to

"use the Evaluation Materials for any purpose other than . . . review of the [U.S. Packaging]

Business and evaluation of a Possible Transaction." Agreement ¶ 1.

9.      By breaching the Agreement and misusing Catalent's highly confidential and

sensitive business information, Sharp and United Drug have caused substantial harm to Catalent.

Sharp and United Drug were successful in their efforts to destabilize the sale process and drive

down the value of the U.S. Packaging Business. On June 19, 2012, Packaging Coordinators, Inc.,

an affiliate of Frazier Healthcare, purchased the U.S. Packaging Business for $█ million, a price

that was $█ million less than the up to $80 million that United Drug had advised Catalent that it

was willing to pay less than nine months earlier.

10.     Moreover, and as United Drug's CEO brazenly bragged during the November 16,

2011 calls, Sharp and United Drug have also misused Catalent's highly confidential and sensitive

business information, which constituted its trade secrets, to poach its customers. In the weeks

immediately following Mr. Fitzgerald's statements, Catalent lost several business opportunities to

Sharp, and in the subsequent months Catalent lost additional business opportunities to Sharp.

4

11.     The breaches of the Agreement by Sharp and United Drug also damaged Catalent by destabilizing its customer base.  Following Mr. Fitzgerald's statements, multiple Catalent customers informed Catalent that they were aware of Mr. Fitzgerald's statements and asked questions concerning the information disclosed by Mr. Fitzgerald and the impact of that information on their potential future business with Catalent.

### PARTIES AND JURISDICTION

12.     Catalent, a Delaware corporation with its principal place of business in Somerset, New Jersey, is a leading provider of services ranging from drug and biological development services to delivery technologies to supply solutions.  Catalent's U.S. Packaging Business provided, through its Philadelphia, Pennsylvania and Woodstock, Illinois facilities, standalone outsourced, non-integrated commercial packaging services to the pharmaceutical and biotechnology industries for products approved for commercial sale other than for clinical trial purposes.

13.     Sharp, a Pennsylvania corporation with its principal place of business in Allentown, Pennsylvania, is part of United Drug's Contract Packaging Group.  It partners with United Drug's affiliates to provide packaging solutions for pharmaceutical companies in the United States and Europe.

14.     United Drug, a publicly-traded Irish corporation with its principal place of business in Dublin, Ireland, provides outsourced commercialization solutions to healthcare companies.  United Drug is a sophisticated, global corporation that has been doing business since 1948, operates in five major international markets, employs over 4,500 people around the world, and consistently generates over $2 billion in annual revenue.  Sharp is a wholly-owned subsidiary of United Drug.

5

15.     Non-party Blackstone Advisory Partners L.P. ("Blackstone") served as Catalent's financial advisor in connection with its sale of its U.S. Packaging Business.  Indications of interest, inquiries, requests for information, and other communications concerning the sale process were submitted by potential and actual bidders, including Sharp and United Drug, to Blackstone in New York, New York, where Blackstone coordinated the sales process.

16.     Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a).  The parties are of diverse citizenship, and the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

17.     Pursuant to paragraph 14 of the Agreement, the parties agreed to submit to jurisdiction in this Court and agreed that this Court is the proper venue for this dispute. Moreover, jurisdiction in this District is also proper pursuant to CPLR 301 and 302 based on, among other things, Sharp and United Drug's extensive contacts and communications concerning the U.S. Packaging Business with Blackstone, which coordinated the sales process from New York.

<u>FACTS</u>

**A. The Sale of Catalent's U.S. Packaging Business**

18.     During the summer of 2011, Catalent decided to commence a process to potentially divest itself of its U.S. Packaging Business, which is in Catalent's Medication Delivery Solutions division, one of Catalent's four main lines of business.

19.     On August 2, 2011, Catalent engaged Blackstone to serve as its financial advisor in connection with the sale process, which was to be conducted by way of a targeted auction process given the highly sensitive nature of the business information to be provided during the sale process in an extremely competitive industry.

6

20.     Shortly thereafter, Blackstone began reaching out to a targeted universe of potential bidders, consisting primarily of strategic buyers, to gauge their interest in participating in the auction.  To those potential bidders who expressed interest in learning more about the U.S. Packaging Business, Blackstone sent a draft non-disclosure agreement.  Given the highly confidential and sensitive nature of the business information that was to be provided during the diligence process, Catalent required that potential bidders first execute a non-disclosure agreement before proceeding with the diligence process.  The non-disclosure agreement, a standard feature of corporate transactions, barred bidders from disclosing to the public anything related to the sale process (including the existence of the process itself) and precluded bidders from using any information that they received from Catalent for any purpose other than evaluating a Possible Transaction.  The non-disclosure agreement, pursuant to which Sharp and United Drug received Catalent's highly confidential and sensitive business information, is described more fully below.

21.     After a potential bidder executed a non-disclosure agreement, the process was designed to provide diligence materials to potential bidders in stages, so that the more interest a bidder expressed – through the investment of management time, senior management involvement, and expenditure of resources on third party advisors – the more information Catalent would disclose.

22.     If a potential bidder, after reviewing a written executive summary (the "Executive Summary") regarding the U.S. Packaging Business, was interested in pursuing a Possible Transaction, substantial diligence opportunities were provided by Catalent.  Blackstone invited a limited number of potential bidders to participate in a "management presentation" with Catalent executives, the management of the U.S. Packaging Business, and representatives from

7

Blackstone.  The management presentation consisted of an oral and written presentation that included highly confidential and sensitive information regarding the U.S. Packaging Business's financial performance, operations, and customers.  After the management presentation, each potential bidder was also provided a tour of the U.S. Packaging Business's Philadelphia, Pennsylvania facility.  Each potential bidder was also invited to ask follow-up questions about the U.S. Packaging Business.

23.     Following the submission of written indications of interest to acquire the U.S. Packaging Business, Catalent permitted access to an electronic data room, where a potential bidder could access Catalent's highly confidential and sensitive information regarding, among other things, the U.S. Packaging Business's financial performance, operations, and customers.  The data room contained financial information for the U.S. Packaging Business, such as revenue models, operating models, and balance sheets.  It also included information concerning Catalent's top suppliers and customers and provided access to Catalent's customer contracts, loan documents, and compliance reports.

24.     Catalent also gave potential bidders the opportunity to take additional tours of its U.S. packaging facilities.

25.     In sum, Catalent was willing to provide potential bidders with access to whatever information they reasonably required to enable them to determine whether to submit a firm written offer to acquire the U.S. Packaging Business in exchange for their agreement to keep the information confidential pursuant to a non-disclosure agreement.

**B. The Non-Disclosure Agreement**

26.     Sharp, on behalf of itself and its parent company, United Drug, was one of the entities that expressed its interest in obtaining more information about Catalent's U.S. Packaging

8

Business.  Sharp was considered a "strategic" buyer, since it was in the same line of business as Catalent and was one of Catalent's primary competitors.  In response to Sharp's expression of interest in participating in the sale process, on August 10, 2011, Blackstone sent a draft of a non-disclosure agreement to George Burke, Sharp's President and CEO.  In response, an attorney representing both Sharp and United Drug emailed his comments regarding the draft non-disclosure agreement.  He copied not only Blackstone, Catalent's counsel, and Mr. Burke on the email, but he also copied Liam Logue, United Drug's Director of Corporate Development (who is based in Dublin, Ireland).  After negotiations between counsel regarding the terms of the non-disclosure agreement, Sharp executed the Agreement on August 12, 2011.  As detailed below, by its conduct, including its direct participation in all phases of the sale process, United Drug, which at all times was acting in concert with its wholly-owned subsidiary, Sharp, unequivocally manifested its intent to be bound by the Agreement and/or to assume the Agreement signed by Sharp.

27.    The introduction to the Agreement makes clear that Sharp had requested information solely to consider a possible acquisition of Catalent's U.S. Packaging Business, and for no other reason: "We understand that Sharp . . . has requested information regarding the U.S. commercial packaging business . . . of Catalent . . . in connection with your [Sharp's] consideration of the possible acquisition of all of the outstanding equity interest of the [U.S. Packaging] Business (a 'Possible Transaction')."  Agreement p. 1.  It was only in connection with Sharp and United Drug's consideration of a Possible Transaction that Catalent agreed to furnish Sharp with "certain information relating to the [U.S. Packaging] Business, Catalent and/or its affiliates which is non-public, confidential and/or proprietary in nature."  *Id.*  That information, "together with analyses, compilations, forecasts, studies or other documents prepared by [Sharp], or by [Sharp's] Representatives incorporating or otherwise reflecting such

information or [Sharp's] review of, or interest in, the [U.S. Packaging] Business" was collectively designated as "Evaluation Materials" under the Agreement. *Id.*

28.     In exchange for being permitted access to Catalent's highly confidential and sensitive business information, Sharp, on behalf of itself and United Drug, agreed to substantial confidentiality obligations.  In paragraph 1 of the Agreement, Sharp agreed to "treat all Evaluation Materials as strictly confidential," and was only permitted to disclose the Evaluation Materials to its "Representatives" if those Representatives "need[ed] to know such information solely for the purpose of evaluating a Possible Transaction."  Sharp agreed to inform its Representatives to whom it disclosed the Evaluation Materials "of the confidential nature of the Evaluation Materials and of [Sharp's] obligations under this Agreement."  The Agreement required that any such Representatives agree to be "bound by the terms hereof," and it stated that Sharp "will be responsible for any breach of this Agreement by [Sharp] or any of [its] Representatives."

29.     The term "Representatives" was defined in the Agreement as "directors, partners, officers, employees, agents or advisors (including attorneys, accountants and financial advisors)."  Agreement ¶ 1.  For purposes of the sale process, United Drug functioned as Sharp's Representative and therefore was bound by the terms of the Agreement.

30.     Paragraph 1 of the Agreement made clear that neither Sharp nor its Representatives would, without prior written authorization from Catalent, "distribute any Evaluation Materials or disclose the contents of any Evaluation Materials to any Person other than as permitted by this Agreement."  Nor were Sharp or its Representatives permitted to "use the Evaluation Materials for any purpose other than . . . review of the [U.S. Packaging] Business and

10

evaluation of a Possible Transaction." Sharp and its Representatives were also precluded from using the Evaluation Materials "for any competitive purpose."

31.    Indeed, given the confidential and sensitive nature of the sale process, and the deleterious effect that its disclosure could have on the sale process, as well as on Catalent's customers, Sharp and United Drug were prohibited from disclosing even the existence of the sale process. In Paragraph 4 of the Agreement, Sharp agreed that neither it nor its Representatives "will disclose to any Person the fact that discussions or negotiations concerning a Possible Transaction are or were taking place between [Sharp] and Catalent or any of the terms, conditions or other facts with respect to any such Possible Transaction, including the status thereof, the existence of this Agreement or the fact that the Evaluation Materials have been made available to you or your Representatives."

32.    In sum, Sharp and United Drug agreed that they would not disclose to the public anything related to the sale process or to use the information that they obtained during the sale process for any purpose other than for evaluating a Possible Transaction. Three months after Sharp and United Drug made those explicit promises, and after receiving Catalent's highly confidential and sensitive business information in return, they broke those promises and breached the Agreement.

### C.  Sharp and United Drug Receive Catalent's Highly Confidential and Sensitive Information

33.    Following the execution of the Agreement, Blackstone provided Sharp with the Executive Summary, which contained information regarding the U.S. Packaging Business's financial performance, operations, and customers. Consistent with the Agreement, the Executive Summary also included a written statement advising Sharp to, among other things, maintain the confidentiality of the information being provided.

34.    After receiving the Executive Summary, Sharp and United Drug determined to proceed with exploring a Possible Transaction. Numerous representatives of Sharp and United

11

Drug, including Mr. Burke and Liam Fitzgerald, the Chief Executive Officer of United Drug (who is based in Dublin, Ireland), personally attended a management presentation with numerous Catalent executives, including the General Managers of both of Catalent's U.S. packaging facilities, on September 9, 2011. The presentation was followed by a tour of the Philadelphia, Pennsylvania facility of the U.S. Packaging Business.

35.     Mr. Fitzgerald's attendance at the management presentation was particularly noteworthy to Catalent in light of the fact that he is the CEO of a publicly-traded company whose subsidiary was considering purchasing a line of business that was less than 5% of United Drug's size by revenue. At the time, Catalent and its advisors interpreted this unusual level of parent company involvement as evidence of the level of seriousness of Sharp and United Drug in participating in the sale process and the credibility of their interest in purchasing the U.S. Packaging Business.

36.     At the beginning of the September 9 management presentation, Catalent's Vice President for Corporate Development stated that the information being shared during the presentation was highly confidential and that it was being shared pursuant to the Agreement. He stressed that, given the nature of the commercial packaging business, it was particularly important that Sharp and United Drug adhere to their confidentiality obligations pursuant to the Agreement. That is because: in the commercial packaging business parties typically do not enter into long-term supply contracts, customers often have relationships with more than one commercial packager and can easily move all or part of their business from one commercial packager to another, and commercial packagers usually do not possess significant intellectual property rights that operate as barriers to entry for their competitors.

37.     During the course of that presentation, Catalent provided highly confidential and sensitive information to Sharp and United Drug, including to Mr. Fitzgerald, regarding the U.S.

12

Packaging Business, its facilities, and its abilities to meet customer needs.  For example, the presentation disclosed, among other things, (i) detailed information regarding Catalent's capital expenditures at each of the U.S. Packaging Business's facilities since 2009, and the expected capital expenditures at each facility for 2012 and 2013, including the amounts invested and expected to be invested toward those capital expenditures; (ii) detailed information regarding each facility's equipment and capabilities; (iii) detailed information regarding the production volume of each of the U.S. Packaging Business's product types and Catalent's annual capacity to serve its customers' needs for each product type; and (iv) detailed information regarding the U.S. Packaging Business's on-time delivery rates at each of its facilities.

  38. Each and every page of the PowerPoint that Catalent used as part of its September 9 management presentation reflected that the contents of that presentation were confidential, and a statement on the last page of the PowerPoint stated that it contained "highly confidential information." Each Sharp and United Drug representative who attended the September 9 management presentation received a copy of the PowerPoint containing the statements regarding the confidentiality of the information being shared.

  39. On September 14, 2011, Blackstone provided the potential bidders, including Sharp and United Drug, with a "process letter," which set a deadline of September 30, 2011 for the submission of written indications of interest to acquire the U.S. Packaging Business.  The process letter stated, consistent with Paragraph 6 of the Agreement, that "[a]ll inquiries and requests for information should be coordinated through Blackstone.  Under no circumstances should the management or employees of Catalent or any of their affiliates be contacted directly or made aware of the receipt of this information by you."

40.     On September 22, 2011, representatives of Sharp and United Drug participated in a conference call with Catalent representatives during which Catalent shared highly confidential and sensitive information regarding, among other things, its revenue forecasts, anticipated market growth, and the value of its machinery.

41.     On September 30, 2011, by letter to Blackstone in New York, Barry McDonogh, United Drug's Corporate Development Manager for North America, submitted (on United Drug letterhead) a timely indication of interest in acquiring the U.S. Packaging Business.  United Drug's indication of interest stated that its "indicative valuation for [the U.S. Packaging Business] is a price up to $80m on a cash and debt-free basis."  United Drug's letter explained that the $80 million valuation was based on its experience in purchasing Sharp, Catalent's direct competitor in the commercial packaging industry: as the letter stated, "$80m is consistent with what United Drug paid in acquiring its US contract packaging business, the Sharp Corporation."  United Drug's indication of interest acknowledged that Catalent and Sharp were direct competitors in the North American pharmaceutical contract packaging market; nevertheless, in its indication of interest, United Drug stated that it sought to review, among other things, the U.S. Packaging Business's "revenue forecasts," "balance sheet and working capital," "[c]ustomer contracts," and "order book and contracted revenue pipeline."

42.     This was not a hastily-prepared bid by United Drug.  To the contrary, it was made after six weeks of participation in the sale process and after Catalent had provided Sharp and United Drug with a substantial amount of highly confidential and sensitive business information. By the time that United Drug submitted its indication of interest to Blackstone, its executives had already received the Executive Summary, attended a management presentation, toured one of the

U.S. Packaging Business's two facilities, and participated in a conference call with Catalent regarding the U.S. Packaging Business.

43.     In light of (i) the considerable information that Sharp and United Drug had already received from Catalent concerning the U.S. Packaging Business; (ii) Sharp and United Drug's intimate of knowledge of the commercial packaging industry, and the methods of valuation of companies therein, based on, among other things, United Drug's recent acquisition of Sharp; and (iii) United Drug's explicit reference in its indication of interest to the fact that its valuation of the U.S. Packaging Business was consistent with what it had paid for Sharp, Catalent determined that United Drug was the bidder most likely to purchase the U.S. Packaging Business. As such, Catalent instructed Blackstone to contact United Drug to obtain additional information regarding its indication of interest.

44.     Blackstone and United Drug agreed to discuss United Drug's indication of interest by phone on October 5, 2011. During that teleconference, Mr. McDonogh and Mr. Logue of United Drug reaffirmed United Drug's interest in the U.S. Packaging Business and agreed to provide Catalent with additional information regarding its indication of interest.

45.     The next day, on October 6, 2011, Mr. McDonogh, on behalf of United Drug, sent an email to Blackstone confirming that United Drug continued to believe that the U.S. Packaging Business was worth up to $80 million. The email also stated United Drug's belief that the U.S. Packaging Business was worth at least $50 million and that it needed to conduct "a full due diligence of [the U.S. Packaging Business]," including additional tours of the U.S. Packaging Business's facilities.

46.     In light of United Drug's indication of interest and the subsequent telephone and email discussions between United Drug and Blackstone related thereto, Catalent instructed

15

Blackstone to invite Sharp and United Drug to conduct further diligence as part of the auction process for the U.S. Packaging Business.  Catalent instructed Blackstone to provide Sharp and United Drug with additional confidential information about the U.S. Packaging Business, including the confidential information that United Drug had specifically requested in its indication of interest, even though Catalent and Sharp were direct competitors.  Because (i) Sharp and United Drug had acted in a manner that reflected that they had a serious interest in purchasing the U.S. Packaging Business, (ii) Catalent believed that Sharp and United Drug were acting in good faith and not engaging in industrial espionage, and (iii) Sharp and United Drug had promised, in the Agreement, to keep all Evaluation Materials confidential and to not use that material for any competitive purpose, Catalent opened its books to its direct competitor.

47.     On October 10, 2011, Blackstone provided Sharp and United Drug with access to Catalent's electronic data room, which was administered by Blackstone in New York and which contained highly confidential and sensitive information regarding, among other things, the U.S. Packaging Business's financial performance, operations, and customers.

48.     Numerous Sharp and United Drug executives, including their most senior executives, immediately accessed the data room.  For example, on the first day that Sharp and United Drug were given access to the data room, Mr. McDonogh reviewed four of Catalent's confidential documents. The next day, on October 11, 2011, Mr. McDonogh sent an email to Blackstone which stated that he could not find a particular confidential document in the data room and asked whether United Drug would be given access to that document.  Blackstone responded that United Drug should prepare a list of any documents that it wanted to review that were not already in the data room.

49.     When Sharp and United Drug executives accessed the data room for the first time, they electronically agreed that "[a]s a condition to being granted access to the virtual data room" they would

"hold in strictest confidence . . . any Project Information." Each Sharp and United Drug executive who accessed the data room also electronically agreed not to "use any Project Information except to evaluate a potential transaction involving the Company" and not to "disclose, publish or distribute" the Project Information "in any manner." The electronic agreement defined "Project Information" to mean "any and all knowledge, data or information of [Catalent] contained on this web site, except for information which is generally known in the trade or in the industry." The Sharp and United Drug executives who accessed the data room also acknowledged that their "confidentiality obligations are subject to additional terms and conditions contained in a separate agreement with [Catalent] or one or more of its professional advisors." In other words, the United Drug executives who accessed the data room on behalf of United Drug explicitly agreed to be bound by the terms of the Agreement.

50.    Between October 10, 2011 and November 4, 2011, five Sharp executives and four United Drug executives accessed Catalent's highly confidential and sensitive business information in the data room on at least 25 different occasions and viewed 140 of Catalent's confidential documents. Mr. Burke himself accessed the electronic data room on multiple occasions and himself accessed and reviewed 40 of Catalent's confidential documents, including some on multiple occasions.

51.    Among other things, Sharp and United Drug executives reviewed documents containing detailed information regarding the U.S. Packaging Business's profit margins at each of its facilities; reviewed various revenue models for the U.S. Packaging Business; repeatedly reviewed the operating models, balance sheets, and financial statements and financial forecasts for the U.S. Packaging Business; and repeatedly reviewed redacted lists of the top customers and suppliers for the U.S. Packaging Business.

52.    Sharp and United Drug also requested and were given two additional plant tours of the U.S. Packaging Business facilities. At their request, on October 21, 2011, Sharp and United Drug

executives, employees, and consultants participated in a tour of the Woodstock, Illinois facility of the U.S. Packaging Business.  During the tour, Sharp and United Drug personnel took detailed notes of highly confidential and sensitive information presented regarding, among other things, the Woodstock facility's equipment, capital expenditures, technology, and capabilities.

53.     At that time, Sharp and United Drug executives, employees, and consultants also received a written presentation from Catalent regarding its Woodstock facility.  Highly confidential and sensitive information regarding the U.S. Packaging Business's financial performance, operations, and customers was included in the presentation.

54.     At their request, on October 24, 2011, Sharp and United Drug executives, employees, and consultants participated in a second tour of the Philadelphia, Pennsylvania facility of the U.S. Packaging Business (the initial tour of that facility occurred after the September 9 management presentation).  During the tour, Sharp and United Drug personnel took detailed notes of highly confidential and sensitive information presented regarding, among other things, the Philadelphia facility's equipment, capital expenditures, technology, and capabilities.

55.     At that time, Sharp and United Drug executives, employees, and consultants also received a written presentation from Catalent regarding its Philadelphia facility.  Highly confidential and sensitive information regarding the U.S. Packaging Business's financial performance, operations, and customers was included in the presentation.

56.     During the sale process, the presentations, tours, and access to the electronic data room that Catalent provided to Sharp and United Drug gave them, among other things, (i) a thorough understanding of the financial position of the U.S. Packaging Business, including its profit margins; (ii) detailed knowledge regarding the top customers of the U.S. Packaging Business and Catalent's abilities

to meet their needs; and (iii) highly confidential and sensitive information regarding Catalent's future plans and projections.

57.     By letter dated October 25, 2011, Blackstone advised United Drug of, among other things, a November 4, 2011 deadline for the submission of a firm written offer to acquire the U.S. Packaging Business.  The letter again advised United Drug that "[a]ll inquiries and requests for information should be coordinated through Blackstone.  Under no circumstances should the management or employees of Catalent or any of their affiliates be contacted directly or made aware of the receipt of this information by you."

58.     Notwithstanding the fact that Sharp and United Drug (i) received multiple presentations from Catalent management, (ii) accessed the electronic data room at least 25 times and viewed 140 of Catalent's highly confidential and sensitive documents, (iii) participated in three tours of the U.S. Packaging Business's facilities, and (iv) provided a written indication of interest in acquiring the U.S. Packaging Business at a price of up to $80 million, on November 3, 2011 (during a conference call, organized at United Drug's request, between Mr. McDonogh, Mr. Logue, and Blackstone), the United Drug representatives informed Blackstone that United Drug would not be submitting a firm written offer to acquire the U.S. Packaging Business, which would have allowed it to advance to the next round in the sale process.

59.     However, Sharp and United Drug did not withdraw from the auction process, despite their contractual obligation to "promptly notify Blackstone if you decide not to proceed with the Possible Transaction."  Agreement ¶ 5.  Instead, during the November 3, 2011 conference call, the United Drug representatives advised Blackstone that it would continue to consider purchasing the U.S. Packaging Business, but only at an unidentified price significantly lower than the price expressed in its September 30, 2011 indication of interest.

60.     Even after United Drug informed Blackstone that it would not be submitting a firm written offer to acquire the U.S. Packaging Business, Sharp executives continued to repeatedly access Catalent's highly confidential and sensitive documents in the data room, despite Sharp and United Drug's agreement that they were only permitted to review Catalent's confidential information in connection with their consideration of a Possible Transaction.  On November 4, 2011, the day after United Drug informed Blackstone that it would not be submitting a firm written offer, three Sharp executives accessed the data room on numerous occasions and reviewed 40 different confidential Catalent documents.  During the three and a half weeks that Sharp and United Drug had access to the data room, there was only one day, October 11, 2011 (right after the data room was opened), that Sharp and United Drug accessed more of Catalent's confidential documents than they did on November 4, just before their access to the data room was terminated by Blackstone.

**D.  United Drug's CEO Liam Fitzgerald Discloses Catalent's Highly Confidential and Sensitive Information During Two Separate United Drug Quarterly Earnings Calls**

61.     Less than two weeks after United Drug advised Blackstone that it would continue to consider purchasing the U.S. Packaging Business only if the price was significantly lower than what United Drug had previously indicated, Mr. Fitzgerald (who actively participated in the sale process) disclosed the sale process, disparaged Catalent's business, and admitted that Sharp and United Drug were using Catalent's highly confidential and sensitive business information to poach Catalent's customers.  Mr. Fitzgerald's statements, made in an obvious, overt, and bad faith effort to drive down the value of the U.S. Packaging Business, were also in clear breach of the Agreement.

62.     On November 16, 2011, United Drug held two conference calls to provide the public with information about its quarterly earnings.  During the first call, which took place at 10:00 a.m. GMT, Mr. Fitzgerald stated: "We, again, have a situation where we and Anderson

[Packaging Inc.] are the two largest packagers in the US market, currently. The third largest player, Catalent, which is owned by Blackstone is being sold at the moment. So, again, we feel that no matter what happens to that business, whether we were to buy it, or whether somebody else was to buy it, there is good opportunity for us to pick up business off the back of that deal, which is presenting a good opportunity for us to continue the drive momentum in the US in particular." Exhibit A, at 6.

63.     Later on that same call, Mr. Fitzgerald again disclosed that Catalent's U.S. Packaging Business was for sale, and derogated that business: "Our Sharp business [is] in exceptionally good shape at the moment, very good momentum in terms of contract wins; one of really two significant players in the US market, with the third player [Catalent] being sold and underperforming significantly at the moment." Exhibit A, at 9.

64.     Mr. Fitzgerald repeated many of these statements during United Drug's second November 16 call, which took place at 2:00 p.m. GMT. During his introductory remarks, Mr. Fitzgerald stated that "Catalent is currently going through a sale process;" that Catalent "has been under-invested through its private equity owners over the last couple of years;" and that "as a result of [the Catalent sale process] we are picking up a lot of clients from that business . . . and we are benefiting in terms of considerable deal opportunity, or deal flow opportunity I should say, in relation to new business as a result of [the Catalent sale process]." Exhibit B, at 3.

65.     These were not impromptu remarks in response to unanticipated questions; to the contrary, they were intentional and knowing statements, made on two separate calls, designed to drive down the value of the U.S. Packaging Business and impair Catalent's competitive position with its customers based on the highly confidential and sensitive business information that Sharp

21

and United Drug had obtained from Catalent during the diligence process.  These statements also breached the Agreement in multiple, independent respects.

66.     *First*, Mr. Fitzgerald's statements that Catalent's U.S. Packaging Business is "being sold" and was "going through a sale process" were in clear breach of the obligation of Sharp and United Drug to keep confidential "the fact that discussions or negotiations concerning a Possible Transaction are or were taking place" and "the terms, conditions or other facts with respect to any such Possible Transaction, including the status thereof."  Agreement ¶ 4.

67.     *Second*, Mr. Fitzgerald's statements that "no matter what happens to [Catalent's U.S. Packaging Business], whether we were to buy it, or whether someone else were to buy it, there is a good opportunity for us to pick up business off the back of the that deal," and that Sharp and United Drug were "picking up a lot of clients" and "benefiting in terms of considerable deal opportunity" from the sale process, make clear that Sharp and United Drug breached their obligation not to use the Evaluation Materials "for any competitive purpose." Agreement ¶ 1.

68.     *Third*, Mr. Fitzgerald's statements that Catalent's U.S. Packaging Business is "underperforming significantly at the moment" and that Catalent's "private equity owners" "under-invested" in Catalent are in clear breach of the obligation of Sharp and United Drug not to "use the Evaluation Materials for any purpose other than . . . review of the [U.S. Packaging] Business and evaluation of a Possible Transaction."  Agreement ¶ 1.

69.     Mr. Fitzgerald's statements were designed to impair the auction process by which the U.S. Packaging Business was being sold and to destabilize Catalent's customer base, all in an effort to make the U.S. Packaging Business less valuable to potential bidders and to allow Sharp and United Drug to poach Catalent's customers.

22

70.     Mr. Fitzgerald's statements were promptly understood and absorbed by the
market.  Among the participants on United Drug's first November 16, 2011 conference call were
Donal O'Neill, an analyst from Goodbody Stockbrokers; Andrew Fellows, an analyst from
Edison Investment Research Limited; Stephan Gasteyger, an analyst from Jefferies Group, Inc.;
Conor Harnett, an analyst from NCB Stockbrokers Limited ("NCB"); and Jack Gorman, an
analyst from J & E Davy.  The next day, on November 17, 2011, Mr. Harnett, the NCB analyst,
published a report about United Drug that included Mr. Fitzgerald's statements.  On the front
page of his report, in a section titled "Winning new contracts as competitors falter," he stated,
among other things, the following: "In US packaging, Sharp Corporation continues to benefit
from the demise of the number 3 player Catalent, which is currently up for sale. . . . Management
did indicate that the Group had expressed interest in acquiring Catalent, however further analysis
led it to believe that it was better positioned to achieve organic growth in the underlying
business."

71.     After Catalent advised Sharp and United Drug that Mr. Fitzgerald's statements had
breached the Agreement, United Drug's counsel proposed a teleconference between Catalent, United
Drug, and Sharp.  During that call, a representative of United Drug (on behalf of itself and Sharp)
agreed to destroy all copies of the Evaluation Materials that were in United Drug's or Sharp's
possession, custody or control, as required by Paragraph 5 of the Agreement, evidencing United
Drug's understanding that it was bound by the Agreement.

72.     Mr. Fitzgerald was successful in his effort to impair the auction process.  Because
Catalent believed that Sharp and United Drug had a serious interest in purchasing the U.S.
Packaging Business and that they were acting in good faith (and not engaging in industrial
espionage), by November 2011, Sharp and United Drug had received far more of Catalent's

23

highly confidential and sensitive business information than any other potential bidder. Mr. Fitzgerald, by publicly disclosing the sale process and by cherry-picking and disclosing what he perceived to be negative information about the U.S. Packaging Business, destroyed Catalent's control over the dissemination of its highly confidential and sensitive business information and destabilized the auction process. Following Mr. Fitzgerald's November 16, 2011 disclosures, Blackstone had difficulty finding other potential purchasers of the U.S. Packaging Business, and Catalent was unable to sell the U.S. Packaging Business until over seven months after Mr. Fitzgerald's statements. On June 19, 2012, Packaging Coordinators, Inc., an affiliate of Frazier Healthcare, purchased the U.S. Packaging Business for $███million, a price that was $███million less than the price provided in United Drug's indication of interest. Moreover, by acting in a manner that conveyed to Catalent and Blackstone that it was the bidder most likely to purchase the U.S. Packaging Business, United Drug diverted Catalent from actively pursuing other potential purchasers of the U.S. Packaging Business, thereby further impairing the auction process.

73.     Mr. Fitzgerald's statements also damaged Catalent by destabilizing its customer base. As described above, customers in the commercial packaging typically are not bound by long-term supply contracts and often have relationships with more than one commercial packager, and commercial packagers usually do not possess significant intellectual property rights that operate as barriers to entry for their competitors. As such, customers can, and do, easily move all or part of their business from one commercial packager to another. The perception that a particular commercial packager's business is unstable can be sufficient to cause a customer to move all or part of its business elsewhere. Indeed, one of the reasons Catalent repeatedly stressed to Sharp and United Drug that the sale process and the Evaluation Materials were highly confidential was to attempt to prevent the destabilization of Catalent's customer base.

24

74.     Catalent was particularly susceptible to the possibility of losing business to Anderson Packaging Inc. ("Anderson") (which, as Mr. Fitzgerald acknowledged during United Drug's first November 16, 2011 conference call, was, along with Sharp, one of the three primary competitors in the industry) because of the physical proximity of Catalent's Woodstock, Illinois facility to Anderson's Rockford, Illinois facility.  Given the ease with which customers can switch suppliers and the proximity of the Woodstock facility to Anderson's Rockford facility, the loss of customers to Anderson was of particular concern to Catalent.  Following Mr. Fitzgerald's statements, multiple Catalent customers informed Catalent that they were aware of Mr. Fitzgerald's statements and asked questions concerning the information disclosed by Mr. Fitzgerald and the impact of that information on their potential future business with Catalent.

75.     Sharp and United Drug also misused Catalent's highly confidential and sensitive information.  On information and belief, Mr. Fitzgerald's statements led some of Catalent's potential and actual customers to withhold some or all of their business from Catalent because of concerns regarding the effect of the sale process on the U.S. Packaging Business, including, among other things, the "under-invest[ment]" in that business by its owners, as Mr. Fitzgerald claimed.

76.     On information and belief, following the receipt of Catalent's highly confidential and sensitive business information, which constituted its trade secrets, Sharp and United Drug poached Catalent's potential and actual customers.  Within weeks after Mr. Fitzgerald's statements, Catalent lost two business opportunities to Sharp.  Catalent is also aware of at least two additional occasions in 2012 when it lost business opportunities to Sharp.  In light of the fact that United Drug's CEO stated clearly and publicly that United Drug and Sharp were, in breach of the Agreement, "picking up" Catalent's business, it is reasonable to conclude that, based on the "tone from the top" set by Mr. Fitzgerald, Sharp's sales representatives likewise used

Catalent's trade secrets in breach of the Agreement to poach Catalent's potential and actual customers.

77.     When the U.S. Packaging Business loses potential or actual business to a competitor, it sometimes is not aware which of its competitors has secured the business in question, making it likely, in light of the fact that there are only three leading firms in the commercial packaging business, including Catalent and Sharp, that there are additional instances where Sharp poached business from Catalent or Catalent lost business opportunities to another competitor because of Mr. Fitzgerald's statements about which Catalent is not yet aware.

78.     Indeed, there can be instances when the U.S. Packaging Business loses a potential business opportunity and it is not even aware that the customer in question had considered giving Catalent a chance to bid on the business in question.  Therefore, it is likely that there are additional instances, about which Catalent is not yet aware, where Sharp poached business from Catalent or Catalent lost business opportunities to another competitor because Mr. Fitzgerald's statements led potential customers to refrain from even approaching Catalent with business opportunities.

79.     Moreover, when the U.S. Packaging Business loses potential or actual business to a competitor, it sometimes is not provided with a reason why the potential or actual customer chose its competitor instead, and sometimes the reason provided is not the sole (or even truthful) reason for the customer's decision.  As such, it is likely that there are instances, about which Catalent is not yet aware, when it lost business opportunities to Sharp or another competitor because of Mr. Fitzgerald's statements.

**FIRST CAUSE OF ACTION**
**(Breach of contract against Sharp and United Drug)**

80.     Paragraphs 1-79, above, are realleged and incorporated by reference as if set forth in full.

81.     On August 12, 2011, Catalent and Sharp entered into the Agreement.  By its conduct, including its direct participation in all phases of the sale process, United Drug, which at all times was acting in concert with its wholly-owned subsidiary, Sharp, unequivocally manifested its intent to be bound by the Agreement and/or to assume the Agreement signed by Sharp.  United Drug received a draft of the Agreement before Sharp signed it, United Drug's counsel was involved in negotiating the Agreement, and United Drug participated in the September 9 management presentation, the September 9 tour of the U.S. Packaging Business's Philadelphia, Pennsylvania facility, and the September 22 teleconference, during each of which Catalent shared highly confidential and sensitive information with United Drug.   Similarly, United Drug's submission of a written indication of interest which, among other things, requested additional confidential information; its repeated telephone calls and emails with Blackstone relating thereto; its participation in two additional tours of Catalent's facilities; and its repeated viewing of Catalent's confidential documents in an electronic data room, all evidence that United Drug intended and agreed to abide by the terms of the Agreement. Indeed, before senior United Drug executives accessed the data room for the first time, they each explicitly agreed (by way of an electronic confirmation), on behalf of themselves and United Drug, to be bound by the terms of the Agreement.  Finally, during the teleconference proposed by United Drug's counsel following Sharp and United Drug's breach of the Agreement, a representative of United Drug agreed to destroy all copies of the Evaluation Materials that were in United Drug's or Sharp's possession, custody or control, as required by Paragraph 5 of the Agreement, further evidencing United Drug's understanding that it was bound by the Agreement.

27

82.     Moreover, for purposes of the sale process, Sharp treated United Drug as one of its Representatives under the Agreement.  Sharp was contractually required to inform its Representatives of the obligations imposed by the Agreement.  Pursuant to Paragraph 1 of the Agreement, Sharp's Representatives, such as United Drug, agreed "to be bound by the terms hereof."  Sharp also agreed to "be responsible for any breach of this Agreement by [Sharp] or any of [its] Representatives."

83.     Pursuant to the Agreement, Sharp and United Drug agreed, among other things, (i) not to disclose that discussions or negotiations concerning a Possible Transaction are or were taking place (¶ 4), (ii) not to use the Evaluation Materials that they received from Catalent for any competitive purpose (¶ 1), and (iii) to refrain from using the Evaluation Materials for any purpose other than their review of the U.S. Packaging Business and their evaluation of a Possible Transaction (¶ 1).

84.     Catalent performed all of its obligations under the Agreement.

85.     On November 16, 2011, Liam Fitzgerald, United Drug's Chief Executive Officer, disclosed during both of United Drug's public quarterly earnings calls that Catalent was considering a sale of its U.S. Packaging Business, in clear breach of the Agreement.

86.     On those public quarterly earnings calls, Mr. Fitzgerald also disclosed that Catalent's U.S. Packaging Business is "underperforming significantly at the moment" and that Catalent's "private equity owners" "under-invested" in Catalent, in clear breach of the Agreement.

87.     On those public quarterly earnings calls, Mr. Fitzgerald also stated that Sharp and United Drug were "picking up a lot of clients" and "benefiting in terms of considerable deal opportunity" from the sale process, and that "there is a good opportunity for us to pick up [Catalent's] business off the back of [Catalent's] deal" to sell its U.S. Packaging Business.

These statements make clear that Sharp and United Drug used Catalent's highly confidential and sensitive business information for competitive purposes in clear breach of the Agreement.

88.     At no time did Catalent authorize Sharp or United Drug to make the above-described disclosures or engage in the above-described conduct.

89.     By virtue of the foregoing conduct, Sharp and United Drug breached the Agreement.

90.     Catalent has been damaged by the breaches of the Agreement.  As a result of the multiple breaches of the Agreement by Sharp and United Drug, Catalent sold its U.S. Packaging Business on June 19, 2012 for $██ million, a price that was $██ million less than the one proposed in United Drug's indication of interest less than nine months earlier.  Moreover, as described above, Sharp and United Drug intended to, and did, destabilize Catalent's customer base and cause it to lose business opportunities to Sharp and other competitors.

## SECOND CAUSE OF ACTION
**(Misappropriation of trade secrets against Sharp and United Drug)**

91.     Paragraphs 1-90, above, are realleged and incorporated by reference as if set forth in full.

92.     Sharp and United Drug possess Catalent's trade secrets, including its most highly confidential and sensitive business information regarding, among other things, Catalent's financial performance, operations, and customers.

93.     Catalent's trade secrets are among the types of highly confidential and sensitive information that Catalent provided to Sharp and United Drug pursuant to the Agreement.

94.     The Agreement prohibits Sharp and United Drug from using Catalent's confidential information for any purpose other than their review of the U.S. Packaging Business and their evaluation of a Possible Transaction.

95.    On November 16, 2011, Mr. Fitzgerald disclosed that Catalent's U.S. Packaging Business is "underperforming significantly at the moment" and that Catalent's "private equity owners" "under-invested" in Catalent, in clear breach of the Agreement.

96.    Mr. Fitzgerald also stated that Sharp and United Drug were "picking up a lot of clients" and "benefiting in terms of considerable deal opportunity" from the sale process, and that "there is a good opportunity for us to pick up [Catalent's] business off the back of [Catalent's] deal" to sell its U.S. Packaging Business, in clear breach of the Agreement.

97.    On information and belief, Sharp and United Drug misused Catalent's highly confidential and sensitive business information, which constituted its trade secrets, to solicit Catalent's customers, in breach of the Agreement.  In the weeks immediately following Mr. Fitzgerald's statements, Catalent twice lost business opportunities to Sharp, and, in the subsequent months, there have been additional occasions when Catalent lost business opportunities to Sharp. Moreover, as described above, there likely have been additional instances when Catalent lost business opportunities to Sharp that are unknown to Catalent at this time.

98.    By virtue of the foregoing, Sharp and United Drug willfully misappropriated Catalent's trade secrets.

99.    Sharp's and United Drug's misappropriation of Catalent's trade secrets is particularly egregious insofar as, among other things, Sharp and United Drug (i) received multiple presentations from Catalent management, (ii) accessed the data room at least 25 times and viewed 140 of Catalent's confidential documents, (iii) participated in three tours of the U.S. Packaging Business's facilities, (iv) provided a written indication of interest in acquiring the U.S. Packaging Business at a price of up to $80 million, and (v) nonetheless declined to submit a firm written offer for the U.S. Packaging Business.  Instead, while giving the impression that they

were participating in the sale process in good faith, Sharp and United Drug used Catalent's trade secrets to compete with Catalent and derogate its U.S. Packaging Business in clear breach of the Agreement.  The bad faith of Sharp and United Drug is further evidenced by the fact that Sharp executives continued to access Catalent's data room even after they declined to submit a firm written offer.

100.    The misappropriation of trade secrets by Sharp and United Drug has damaged Catalent in an amount to be determined at trial.

WHEREFORE, Catalent respectfully requests that the Court enter judgment as follows:

(a) Directing Sharp and United Drug to pay compensatory damages to Catalent in an amount to be determined at trial, with interest thereon, on Catalent's breach of contract claim;

(b) Directing Sharp and United Drug to pay compensatory and punitive damages to Catalent in an amount to be determined at trial, with interest thereon, on Catalent's misappropriation of trade secrets claim;

(c) Awarding Catalent its costs and disbursements (including expert and attorneys' fees incurred in this action), pursuant to, among other things, Paragraph 9 of the Agreement; and

(d) Awarding Catalent such other and further relief as the Court may deem just and proper.

31

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Catalent demands a trial by jury in this action of all issues triable as of right by jury.

Dated: New York, New York
      July 10, 2012

                   FRIED, FRANK, HARRIS, SHRIVER
                      & JACOBSON LLP

                   By: _____

                        David B. Hennes
                        Samuel P. Groner

                   One New York Plaza
                   New York, NY 10004-1980
                   (212) 859-8000
                   david.hennes@friedfrank.com
                   samuel.groner@friedfrank.com

                    Attorneys for Plaintiff
                    Catalent Pharma Solutions, Inc.

8650705